UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMUEL ALEXANDER KUHL,

Plaintiff, Hon. Phillip J. Green

v. Case No. 1:25-cv-0032

NEWAYGO COUNTY, et al.,

Defendants.
_____________________________________/

**OPINION**

This matter is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 59). The parties have consented to proceed in this Court for all further proceedings, including trial and an order of final judgment. 28 U.S.C. § 636(c)(1). For the reasons stated herein, Defendants' motion will be granted and this action terminated.

**BACKGROUND**

Plaintiff is presently incarcerated at the Richard A. Handlon Correctional Facility (MTU) in Ionia, Ionia County, Michigan, but the events about which he complains occurred at the Newaygo County Jail in White Cloud, Newaygo County, Michigan. (ECF No. 13). Plaintiff sued Newaygo County and several jail personnel in their official and individual capacities: Sheriff Bob Mendham, Undersheriff Chad Palmiter, and Jail Administrator David Cook. (*Id.*). In his first amended complaint, Plaintiff asserts a claim under 42 U.S.C. § 1983, alleging that the Jail's mail and book policies violated his

First Amendment rights. (ECF No. 13, PageID.56). Plaintiff requests injunctive, declaratory, and monetary relief. (ECF No. 13, PageID.49).

Plaintiff alleges that he was intermittently incarcerated at the Newaygo County Jail between August 2023 and May 2025. (ECF No. 13, PageID.49-50). Plaintiff testified in his affidavit that, while incarcerated at the Jail, Administrator Cook refused to give him two publications to which he subscribed due to the Jail's mail and book policies: (1) Prison Legal News and Criminal Legal News, and (2) a "Guide to Pursuing Criminal Appeals for People who are Not Attorneys" from the Michigan Court of Appeals. (ECF No. 64-1, PageID.405).

The Jail's book policy reads as follows:

> A. No hard cover books will be allowed in the facility.
> B. No books or magazines will be allowed in the facility from outside source.
> C. The only books or magazines accepted will be distributed from the library.

(ECF No. 59-3, PageID.342). The Jail's mail policy requires that "[a]ll incoming mail, other than privileged mail, shall be in the form of a 4 inch by 6 inches pre-paid postcard. Photographs used as postcards are prohibited. This does not apply to legal mail." (ECF No. 59-4, PageID.344). Plaintiff asserts that Defendant Mendham enacted and enforced these policies, and that Defendant Palmiter "oversees, upholds, condones, and enforces" the policies "by instructing, training, and supervising Defendant Cook[,] who trains, supervises, and ensures that the jail staff learn and enforce" the policies. (ECF No. 13, PageID.56).

Defendants filed a dispositive motion on the merits. (ECF No. 59). Plaintiff responded to Defendants' motion. (ECF No. 63). Defendants replied. (ECF No. 66). The Court finds that oral argument is unnecessary. *See* W.D. MICH. LCIVR 7.2(d).

**SUMMARY JUDGMENT STANDARD**

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Whether a fact is "material" depends on "whether its resolution might affect the outcome of the case." *Harden v. Hillman*, 993 F.3d 465, 474 (6th Cir. 2021).

A party moving for summary judgment can satisfy its burden by demonstrating that the non-moving party, "having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the moving party makes this showing, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006). The existence of a mere "scintilla of evidence" in support of the non-moving party's position, however, is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005).

While the Court must view the evidence in the light most favorable to the non-moving party, that party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The non-moving

party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence," establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006). Likewise, the non-moving party cannot merely "recite the incantation, 'credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353-54 (6th Cir. 2004).

Accordingly, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735. Stated differently, the "ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Harden*, 993 F.3d at 474.

## ANALYSIS

### I. Preliminary Matters

Plaintiff initiated this action against Defendants in their official and individual capacities, seeking declaratory, injunctive, and monetary relief. (ECF No. 13, PageID.47, 49). Given that Plaintiff is no longer housed at the Jail, because he is either serving a state or federal sentence,[1] any claims for injunctive or declaratory relief are

---

[1] In his January 13, 2026, deposition, Plaintiff testified that he was temporarily incarcerated at the Reception Guidance Center in Jackson, Michigan, but he expected to

moot and are subject to dismissal on that basis alone. *See Cardinal v. Metrish,* 564 F.3d 794, 798-99 (6th Cir.2009) (holding that claims against prison officials for declaratory and injunctive relief are rendered moot when the inmate plaintiff is no longer incarcerated at the facility that employs the defendants against whom such relief is sought, because these defendants lack the ability to provide the prospective injunctive relief the plaintiff seeks).

Official capacity lawsuits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978)). An official capacity suit is to be treated as a suit against the entity itself. *Id.* at 166 (citing *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)); *see also Matthew v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). "Individuals sued in their official capacities stand in the shoes of the entity they represent," and the suit is not against the official personally. *See Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003); *see also Graham*, 473 U.S. at 165-66. Therefore, Plaintiff's official-capacity claims against Defendants are actually brought against Newaygo County, and the Court will construe them as such. *See Watson v. Gill*, 40 F. App'x. 88, 89 (6th Cir. 2002) ("Because the McCracken County Jail is a department of the county, the county is the appropriate party to address (plaintiff)'s suit.").

---

be moved at some point to a federal prison to serve a sentence for a federal conviction. (*See* ECF No. 59-2, PageID.325).

Accordingly, the claims are narrowed to a *Monell* claim against Newaygo County and Plaintiff's First Amendment claims against Defendants in their individual capacities for monetary relief.

**II. First Amendment Claims**

A regulation impinging upon a detainee's constitutional rights must be upheld "if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, (1987). But although such a standard requires deference to the judgment of correctional officers, "we must not confuse deference with abdication." *Stoudemire v. Mich. Dep't of Corr.,* 705 F.3d 560, 572 (6th Cir. 2013). Even "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison," and "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." *Bell v. Wolfish,* 441 U.S. 520, 545 (1979).

This includes the First Amendment "right to receive mail and to access reading material." *Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989)). Yet restrictions on the receipt of publications that would ordinarily be "unjustified" may be permissible in the jail setting. *Thornburgh*, 490 U.S. at 407-08. The Supreme Court has long been mindful that the judiciary is "ill equipped" to resolve the "complex and intractable" problems facing American jails "by decree," and it has afforded considerable "deference" the judgment of "prison authorities." *Turner v. Safley*, 482 U.S. 78, 85 (1987) (internal quotation marks

omitted) (quoting *Procunier v. Martinez*, 416 U.S. 404-05 (1974)). So, although "imprisonment does not automatically deprive" detainees of their First Amendment protections, the Court has noted that "the Constitution sometimes permits greater restriction of" a detainee's rights than it would allow elsewhere. *Beard v. Banks*, 548 U.S. 521, 528 (2006).

The United States Supreme Court in *Turner* identified four factors to aid in the determination whether the policy is "reasonably related to legitimate penological interests": "(1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest asserted to justify it; (2) the existence of alternative means for inmates [and third parties] to exercise their constitutional rights; (3) the impact that accommodation of these constitutional rights may have on other guards and inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation." *Cornwell v. Dahlberg*, 963 F.2d 912, 917 (6th Cir. 1992) (citing *Turner*, 482 U.S. at 89-91); *see also Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005).

Under the first *Turner* factor, "the governmental objective must be a legitimate and neutral one." 482 U.S. at 90. This standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Flagner v. Wilkinson*, 241 F.3d 475, 484 (6th Cir. 2001) (quoting *Turner*). Instead, the issue is simply whether the policy at issue is reasonably related to a legitimate

penological interest. *Id.* "The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). "If the restriction or practice [is] reasonably related to legitimate prison concerns, there is no violation of the First Amendment." *Washington*, 2021 WL 2895192, at *6. The Sixth Circuit has noted that the last three *Turner* factors "should be balanced together." *Flagner v. Wilkinson*, 241 F.3d 475, 484 (6th Cir. 2001).

Courts are to give "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). *See also Hum. Rts. Def. Ctr. v. Baxter Cnty. Arkansas*, 999 F.3d 1160, 1164 (8th Cir. 2021). The Court applies these factors to the present case to determine whether the Jail's book and mail policies unconstitutionally restrict Plaintiff's First-Amendment rights.

**A. Mail Policy**

Defendants assert that there are two legitimate penological interests behind their postcard policy: (1) safety and security; and (2) the efficient use of resources. (ECF No. 59, PageID.307-08). Plaintiff acknowledged during his deposition that the Jail's concern for contraband entering the facility by mail through dipping paper in narcotics is a "legitimate issue." (ECF No. 59-2, PageID.338). The Court finds that the penological interests asserted by Defendants are legitimate. *See, e.g., Jones v. Campbell*, 23 Fed. Appx. 458, 462 (6th Cir. 2001) (reducing burden on staff who processes

the mail is a legitimate government interest); *Perez v. Oakland Cnty.*, 466 F.3d 416, 431 (6th Cir. 2006); *United States v. Collins*, 683 F.3d 697, 704 (6th Cir. 2012); *Acord v. Brown,* No. 91-1865, 1992 WL 58975, at *2 (6th Cir. March 26, 1992) (preventing fire hazards in correctional facility is a legitimate penological interest); *Thornburgh*, 490 U.S. at 415 (maintaining institutional security and order is a legitimate penological interest); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (same); *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (same).

To establish a rational connection, Defendants provide evidence in support of their motion of an affidavit from Newaygo County Jail Administrator David Cook, who testified the following. The mail policy was implemented "to curb the entry of narcotics and other contraband into the Jail" (ECF No. 59-5, PageID.349) as Administrator Cook was "aware of incidents in the past when pages of paper have been used to smuggle cannabinoids and methamphetamines into the Jail" (ECF No. 59-5, PageID.350). "The Jail would not be able to adequately and safely store the large volume of mail generated by allowing all types of incoming non-legal mail which, would create a fire hazard." (*Id.*). "Allowing all types of incoming non-legal mail would also strain the Jail's limited resources" to sort, inspect, and deliver the mail. (*Id.*).

In response, Plaintiff attempts to overcome the substantial deference owed to prison administrators by arguing that the Jail's postcard policy is arbitrary and exaggerated in practice. (ECF No. 64, PageID.382). In support of this assertion, Plaintiff submits his declaration that largely contains statements that are either

conclusory or unsupported by personal knowledge, rendering them inadmissible. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir. 1992) (affidavit statements that are "nothing more than rumors, conclusory allegations and subjective beliefs" are not admissible evidence at the summary judgment stage); *see also Edelstein v. Gmoser*, No. 21-3292, 2022 WL 4372200, at *4 (6th Cir. Aug. 29, 2022) ("[S]tatements that lack personal knowledge are inadmissible at the summary judgment stage").

To the extent Plaintiff points to matters to which he has personal knowledge, Plaintiff stated the following in his affidavit. Contrary to the Jail's policies, he and two other inmates received multiple uncopied picture postcards (ECF No. 64-1, PageID.401), and he received and kept boxes of uncopied legal discovery pages (ECF No. 64-1, PageID.408). On one occasion, he received a box containing five thousand pages of discovery mailed to him from his attorney. (*Id.*). "[N]one of this mail was copied," he kept the box "in clear view" under his bed, and "Jail staff searched D-2 at least three times" without mentioning "multiple boxes" or the "voluminous amount of paper" in his cell. (*Id.*).

In reply, Defendants argue that Plaintiff's testimony "at most allege[s] episodic deviations." (ECF No. 66, PageID.419). The Court agrees.

The Jail's policy rationally furthers the above interests. Regarding security, the Jail "need not present evidence of previous incidents stemming from the receipt by inmates of letter mail—'prison officials may also seek to prevent harm that has yet to occur.' " *Proch v. King*, No. 22-12141, 2026 WL 867494, *3 (E.D. Mich. Mar. 30, 2026)

(quoting *Simpson v. Cty. of Cape Girardeau*, 879 F.3d 273, 279 (8th Cir. 2018)). "[The jail] does not even have to show that its interests will actually be furthered by the policy, only that there is a rational relationship between the policy and the objectives." *Id.* at *4. It is reasonable that contraband could be smuggled into the jail via mail and rational that limiting non-legal mail to postcards reduces such a risk. *Id.*; *Simpson*, 879 F.3d at 280.

Likewise, regarding efficiency, "the jail 'does not have to show that efficiency was or will actually be furthered . . . [i]t only needs to show that rationally the policy could lead to more efficiency.' " *Proch*, No. 22-12141, 2026 WL 867494, *4 (quoting *Simpson*, 879 F.3d at 280). It is rational that not needing to open, review, and sort envelopes and pages of paper lessens allows officers to spend more time and energy on other tasks. *Proch*, No. 22-cv-12141, 2026 WL 867494, *4; *Simpson*, 879 F.3d at 280. "County jails have limited staffing and other cases have recognized that postcard-only policies . . . can save officers considerable amounts of time." *Proch*, No. 2:22-cv-12141, 2023 WL 11829097, at *7.

Plaintiff fails to provide evidence that creates a genuine issue of material fact that there is a valid, rational connection between the mail policy and the legitimate government interests asserted to justify it. Accordingly, the first *Turner* factor weighs in Defendants' favor.

Turning to the remaining *Turner* factors, the Court finds that, based on the evidence, these factors also weigh in favor of Defendants.

Alternative channels of communication were still available to Plaintiff under the Jail policy as Administrator Cook testified that Plaintiff utilized a Chirp device at $0.10 per text message to correspond with any cell phone with text-messaging capabilities at any time to send messages "regularly." (ECF No. 59-5, PageID.350). Although Plaintiff states that "[t]he Chirp device becomes very expensive" in long conversations (ECF No. 64-1, PageID.401), "there is no authority before this Court suggesting that prisoners must be provided with free alternatives for communication." *Proch*, No. 2:22-cv-12141, 2025 WL 4686614, at *5 (E.D. Mich. May 14, 2025), *adopted in part, rejected in part,* No. 22-12141, 2026 WL 867494 (E.D. Mich. Mar. 30, 2026).

Administrator Cook testified in his declaration that, under the current postcard-only policy, one officer spends one to two hours sorting, inspecting, and delivering the mail, which would increase to two officers spending four to six hours under a more expansive policy. (ECF No. 59-5, PageID.350). He further testified that "[t]he increased workload would greatly hinder the day-to-day operations of the Jail by taking corrections officers away from their primary duties of ensuring the safety and security of the Jail." (*Id.*). Jails need not implement the "least restrictive" policy available; however, if the detainee can identify "some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal," then the jail's chosen policy might be unreasonable. *Bazzetta*, 539 U.S. at 136. Plaintiff proffers that the Jail staff could use "their faster copier" (ECF No. 64, PageID.389) or copy all incoming mail as they do legal mail "as a de minimis

way" to minimize Defendants' concern of mail contraband (ECF No. 64-1, PageID.399). Although Plaintiff suggests this alternative, the record contains no evidence contradicting Administrator Cook's testimony regarding the operational strains and costs associated with copying all incoming mail. The *Turner* factors all weigh against Plaintiff's claim for First Amendment violations regarding the Jail's mail policy. Accordingly, the Court grants summary judgment in favor of Defendants on this claim.

**B. Book Policy**

Defendants assert the same legitimate penological interests as their mail policy in support of their book policy: (1) safety and security; and (2) the efficient use of resources. (ECF No. 59, PageID.309). For the same reasons as above, the Court finds that the penological interests asserted by Defendants are legitimate.

Under the first *Turner* factor, to establish a rational connection between the book policy and the legitimate interests, Defendants point to the affidavit of Administrator Cook, who testified the following. The book policy was implemented in light of various previous experiences. (ECF No. 59-5, PageID.351). "[M]ultiple incidents" occurred in which a third party ordered a book to their house "from a vendor/publisher such as Amazon or Barnes and Noble," "placed narcotics in the book/publication," "resealed the package," then created and affixed "[a] fake shipping label" to the package before shipping it to inmates at the Jail. (*Id.*). The Jail also had instances of "inmates hoarding books and placing them around the cell doors," "creat[ing] a safety issue around proper egress from the cell in the case of an emergency." (*Id.*). "Inmates have also

used books to block windows in their cells and have used them in laundry bags to work out," which "endanger[s] Jail corrections officers and other inmates since the laundry bags filled with books could be used as a weapon." (*Id.*). Finally, the Jail experienced instances of "physical alterations between inmates over books ordered from outside sources, which places the safety and security of Jail staff at risk from being required to respond to the fights as well as that of the inmates involved in the altercation." (*Id.*).

In response, Plaintiff points to his affidavit, stating, *inter alia*, that "[b]ooks are not used to block windows because the ledges are too thin to support enough books to cover the very large windows in the jail" (ECF No. 64-1, PageID.402) and that an inmate "walked in circles" with books in a laundry bag "for over an hour to exercise" and "jail officers did not take the bag." (ECF No. 64-1, PageID.400). However, as noted above, conclusory statements in an affidavit without personal knowledge are inadmissible here. (ECF No. 66, PageID.422). *See Mitchell*, 964 F.2d at 584-85; *see also Edelstein*, No. 21-3292, 2022 WL 4372200, at *4.

The Court finds that the Jail's policy rationally furthers the above interests. Because book shipments could be used as a means for smuggling contraband, and there is evidence of such in the past, there was at least a "logical" expectation that eliminating this channel could curtail the entry of contraband. *See Turner*, 482 U.S. at 89-90. Similarly, by banning personal outside books, the Jail logically aims to minimize demonstrated issues of blocked doorways and windows, fights over books, and the use of books as weapons, creating a safer, secure, and more efficient institution. *Id.*

Plaintiff fails to provide evidence that creates a genuine issue of material fact that there is a valid, rational connection between the book policy and the legitimate government interests asserted to justify it. Accordingly, the first *Turner* factor weighs in Defendants' favor.

Turning to the remaining *Turner* factors, the Court finds that, based on the evidence, these factors also weigh in favor of Defendants.

Under the second factor, alternative channels of news and legal research were still available to Plaintiff under the Jail book policy as Administrative Cook testified that "[t]he Jail has an online law library available to inmates including, Plaintiff, through a kiosk." (ECF No. 59-5, PageID.352). Through the kiosk, Plaintiff had access to a law dictionary, a criminal handbook, the Federal Rules of Criminal Procedure, the Federal Rules of Civil Procedure, Michigan Court Rules, federal and state statutes, and federal and state caselaw, including "all federal circuit court of appeals, state court of appeals, state supreme courts, and the United States Supreme Court." (ECF No. 59-5, PageID.353). Additionally, Administrator Cook stated in his affidavit that Plaintiff had access to a television 24 hours a day with "access to all local news stations" and "several national news channels." (ECF No. 59-5, PageID.351). Plaintiff acknowledged that he used the provided book carts (ECF No. 64-1, PageID.403) and Chirp to message family members who utilized various tools to aid him in his legal research, including "AI discussions," caselaw searches, and access to PACER (ECF No. 64-1, PageID.398). Plaintiff testified that although news stations were available, "several inmates

complained that they did not like watching the news," so he "did not watch the news often to avoid conflict." (ECF No. 64-1, PageID.407). This is insufficient to create a genuine issue of material fact.

Under the third factor, Administrator Cook testified that "allowing books and publications from outside sources would also place a significant strain upon the Jail's limited resources." (ECF No. 59-5, PageID.351). Administrator Cook points out that the Jail has an average daily population of approximately 240 inmates whose average length of stay is less than sixty days. (ECF No. 59-5, PageID.351-52). Administrator Cook testified that, in light of this, "[t]he amount of time spent on inspecting each and every book and publication coming into the Jail would severely hinder the Jail's daily operations as it would divert corrections officers from performing their primary duties of ensuring the safety and security of the Jail as well as the health and safety of the inmates." (ECF No. 59-5, PageID.352). He also noted that Jail staff would have to store the ordered books and publications and return them to the sender where applicable upon inmates' transfers or releases, resulting in an even "larger workload" and limited storage space. (*Id.*). Plaintiff offers no admissible evidence to create a genuine issue of material fact regarding these statements. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90.

Finally, under the last factor, Plaintiff fails to suggest an alternative policy that "fully accommodates [its] rights at a *de minimis* cost to valid penological interests." *Id.* at 91. Administrator Cook testified that the federal Bureau of Prisons and Michigan Department of Corrections have "considerably larger budgets, which enables them to hire officers specifically for the purpose of sorting and inspecting these materials" and prison populations at those facilities are not "transitory" in the way the Jail population is. (ECF No. 59-5, PageID.353). Again, Plaintiff provides no admissible evidence to create a genuine issue of material fact here. The *Turner* factors all weigh against Plaintiff's First Amendment claim regarding the Jail's book policy. Accordingly, the Court grants summary judgment in favor of Defendants on this claim.

**III. *Monell* Claim**

To prevail on a *Monell* claim, Plaintiff must establish the existence of a municipality custom or policy, a constitutional violation, and a causal link between the two. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). In other words, a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. The Court first considers whether an underlying constitutional violation occurred. *Monell*, 436 U.S. at 691 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort"). Therefore, one need not examine whether there is a causative link between a custom or policy and a subsequent event, unless that event constitutes a constitutional violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If

a person has suffered no constitutional injury . . . the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.”). In this case, because Plaintiff has failed to create a genuine issue of material fact as to the existence of any underlying constitutional violation committed by any Defendant, this Court need not reach the issue of whether there is a connection between the policy and Defendants’ actions. For these reasons, Defendant Newaygo Couty cannot be held liable under Section 1983.

**IV. Qualified Immunity**

Defendants Cook, Palmiter, and Mendham seek qualified immunity but having found that no constitutional violation occurred, the Court need not reach the question of qualified immunity. *See Purisch v. Tennessee Tech. Univ.*, 76 F.3d 1414, 1424 (6th Cir. 1996).

## CONCLUSION

For the reasons articulated herein, Defendants’ Motion for Summary Judgment (ECF No. 59) is granted and this action terminated. An Order consistent with this Opinion will enter.

Respectfully submitted,

Dated: September 17, 2026

/s/ Phillip J. Green
PHILLIP J. GREEN
United States Magistrate Judge